The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Ms. Walker, it's a little bit dark in here. Do you have any control over the lights? I do not. I will check on that. Maybe we could brighten things up. All right, let's begin with our first case. Mr. Lindsey, Ms. Lindsey, we'd be happy to hear from you. Thank you, Your Honors. Good morning, Your Honors, Counsel, and may it please the Court. Jillian Lindsey on behalf of the appellants. We're here to address several errors at the district court level, and these were errors that removed claims, remedies, and evidence from the jury. We ask that this court reverse and remand for a new trial so that the right claims with the right remedies and the right evidence can be heard by a jury to reach the right result. I've divided my argument into three parts to assist with the organization today. The first is the ruling on summary judgment in the face of factual issues that would preclude summary judgment and require a jury to decide. The second is judgment as a matter of law being granted when there was evidence for a reasonable juror to find and find it in favor of Elgin. And several evidentiary rulings that created a distorted and incomplete record for the jury to consider. For those reasons and the reasons we'll address today and in our briefs, we ask that you reverse and remand for a new trial. Now, you also have a claim that you want another judge. You threw that in there, too. Yes, Your Honor. You didn't mention that. Yes, Your Honor. That is addressed in our briefs. We have requested reassignment. We understand that it's up to the discretion of this court and that in this jurisdiction that is not the common practice. We have made that request for the benefit of the court and the parties. This was a heavy trial with many, many evidentiary rulings. And with that, we would leave it to the court's discretion, just to understand the case. Well, I've always found Judge Berger to be a very fine judge and very fair, and I've looked over this, and you may disagree with one ruling or another, but that's a pretty tough position to take that you ask us to have. It's very insulting to a district judge. It implies that they cannot be impartial. And speaking for myself, I do not think that's warranted as a general matter with this judge, nor was it warranted by anything in this case. Understood, Your Honor. And with that, we . . . No, but you also did it without specifying any particulars to support it. You just threw it in at the end of your brief. You want another judge. You want a reversal, and you don't want another judge. I was taken aback by it, personally. It was not our intent to have that impression on the court. We have seen that, while it is not the practice here in some jurisdictions, it is . . . Did you try the case? Yes, Your Honor. So you spent time in the courtroom in Charleston? Yes, Your Honor. And you got to know Judge Berger? Yes, Your Honor. I really just cannot stress that I do not like that on the changing of the judge, because it implies not only that you think a judge is wrong, but you think that judge cannot be impartial. That insinuates that this judge is incapable of being impartial, and I just want to state my strong disagreement with what you're implying. Understood, Your Honor. It was not our intent to imply or insinuate anything with respect . . . I'm going to have to say that I agree with Judge Wilkinson, and I've known Judge Berger personally since she was the chief state prosecutor in Kanawha County where I practiced. She was a state court judge before whom I practiced, and she was a federal judge, became a federal judge, and she was an assistant U.S. attorney there as well. I don't think I ever dealt with her that way, but I did get to know her because of her . . . as a state court judge and as a state prosecutor. She's about as even-handed as anybody I was ever around, and I probably shouldn't be expressing maybe that strong personal preferences, but I have them. Maybe you can move to disqualify me, but I really think highly of Judge Berger. I'll put that on the record. Thank you, Your Honor. To be clear, Judge Berger did an excellent job preserving the record in this case. We understand and appreciate that she has had a distinguished and esteemed career, and we did not mean to imply anything about her qualifications, ability, or potential bias by asking for this request. It was indeed a combination of practices in other jurisdictions where we have seen this and the extreme heavy load that this case took on. It was a multi-week, heavy evidence case with hundreds of documents being moved to seal, and we would just like to reiterate that we do not intend to imply or suggest anything with respect to Judge Berger's ability to remain impartial or her ability in making that request. With that, Your Honors, I'd like to move on to discussing the summary judgment ruling. On summary judgment, there are three independent reversible errors. Agreeing on any one of these errors would warrant reversal of summary judgment. The first would be that an issue of fact precluded summary judgment, and the district court failed to address and consider the complete facts in its analysis. Now, that factual question is whether or not the restrictive covenants at issue were ancillary to the sale of a business. As I'm sure this court is familiar, Mr. Dillon sold his business to Elgin's predecessor in November of 2013, and in that sale signed a purchase agreement and an employment agreement, both of which contain restrictive covenants. Now, we know this is a question of fact because it has been discussed as an issue of fact in several cases, and we would point you to the Palmer decision out of the Eleventh Circuit. And in this case, the facts that support that this was ancillary to the sale of the business and presented on summary judgment were the asset purchase agreement itself lists the employment agreement as a necessary document for closing, meaning without that employment agreement, the purchase agreement would not have been closed. Mr. Dillon admitted in his deposition that Elgin wanted to acquire his business and grow it with him at the helm. One of the assets considered in this purchase was Mr. Dillon's continued leadership and role within the company. The covenants at issue run from the same date. They both run from November 13, 2013. That is the date of the sale of the business. That is when the covenants in both the purchase agreement and the employment agreement start. These documents were signed the same day by the same parties represented by counsel in the same meeting. This was one integrated deal. Unlike some of the cases at issue in the briefing, Mr. Dillon had complete bargaining power on his side of the deal. He was the sole owner. Mr. Dillon could decide whether he wanted to agree to these terms or not. He was not carried along as a minority owner or a stockholder or even a class B owner of interest that you might see in an employment context. He was the owner of a business selling it to Elgin and making promises in connection with that sale and securing the highest possible price, a cash price of $3.47 million in exchange for those promises. This was an integrated deal that the parties entered as one. But all of this doesn't mean that the—I'm not sure how that affects the question of the breach of restrictive covenants because I understand you say, well, he agreed to those as a matter of contractual negotiation, but isn't it also a significant issue of West Virginia public policy? Doesn't the West Virginia Supreme Court take a dim view of overly broad, non-compete agreements? Your Honor, that's an excellent point. We would point also to the fact that the wrong law was applied under the party's choice of law. And with respect to West Virginia, it may have a willingness to examine these agreements more closely than Delaware, the choice of law that the parties selected in their contract and freely chose. But there is no fundamental public policy in West Virginia that says these non-competes or restrictive covenants cannot be upheld, especially in the sale of a business context. They are more freely upheld. With respect to the choice of law— This one seemed to me to be extraordinarily broad. It spanned more than a year, and it covered the entire United States. I haven't seen these non-compete agreements. We see a lot of them up here, and I haven't seen many of them that are as broad as this one, and I just don't know what interest was served by preventing this individual from competing anywhere in the United States because Eldridge's business didn't extend to the entire United States. And why was it necessary to go on for more than a year? Most courts think non-compete agreements that extend for more than a year are too long. Your Honor, there are a few points— This is a very aggressive non-compete agreement. If I may respond first to your point with respect to time. The non-compete and restrictive covenants in general apply for the time Mr. Dillon worked at Elgin and for one year thereafter, just one year, not beyond a year. Also, on its face, it only applies absent written agreement from the parties to do something else, and that's what we saw here. When Mr. Dillon gave notice that he wanted to slow down, have better work-life balance, open a small repair shop, Elgin agreed to allow his non-compete to run in tandem with his continued employment, a period when he received his complete salary, complete benefits, and retained the title of president. So when you look at how this played out and what the parties' agreement was in fact, and at the summary judgment stage, the way it should have been assessed, had Mr. Dillon honored those— Your basic argument is that he contractually agreed to this, correct? That's one argument, yes, Your Honor. All right, and what I'm saying is that that carries you a certain distance, but when you have something that both spatially and temporally is very, very broad, doesn't West Virginia policy enter in, not in a marginal case? I would think that the freedom of contract argument would prevail, but I'm not sure whether it prevails in a situation where you have a non-compete as it goes on for as long as this one or it extends as widely as this one. In other words, I think it's a legitimate point to make that this is a freedom of contract question, and I think that carries you a good ways, but I don't think it allows you to put things in that disadvantage somebody from competing. At some point, West Virginia public policy, which has been expressed repeatedly in that state, that would seem to me to be controlling. And, Your Honor, if this contract was looked at pursuant to the sale of a business, it would be clearly upheld under West Virginia law. If this contract is viewed under Delaware law, the party's choice of law, it would be upheld. And the facts as they stand, with only two months remaining on the restricted time period after he leaves Elgin's employment and a factual dispute as to Elgin's reach for the business, there is evidence in the summary judgment record to support a nationwide reach, both with respect to Elgin delivering machines nationwide and efforts to market nationwide. And we see in the case law that having a facility in each state is not the requirement. In today's modern world, national non-competes have more and more import as we are working on the Internet and servicing clients from further distances. The key test is if there is a reasonable relationship to a legitimate, protectable business interest. And to protect Elgin's business interest from the exact threat that Mr. Dillon posed, this covenant was reasonable. It not only mapped the work that Elgin does, but it mapped the work that Mr. Dillon did with Elgin's clients for big companies like Dubbs and Darling Ingredients, which were serviced nationwide. And with the only two months that remained on the non-compete, had he honored it, a nationwide geographic scope is certainly reasonable for that short amount of time. Well, these non-compete agreements, in addition as a matter of West Virginia law, they by their very name suppress competition. They do two things. Number one, they disable a person from taking his own business initiatives and starting up a business of his own. And he's prohibited from doing that, so you're disabling a person in that sense. And you're also suppressing competition. And competition is generally thought from a standpoint of a consumer to be a positive benefit. Your Honor, I see that I'm out of time. May I answer? Why don't you, if my co-panelists have a question for you, that's fine. But otherwise, you've got some time for rebuttal. Understood. Bob, do you have any questions? I'm fine. Roger, we don't have any questions. We do have some rebuttal time, okay? Thank you, Your Honors. Mr. Harvey? Good morning. May it please the Court. My name is Shane Harvey. I'm here with my law partner today, Grace Herney. We represent Chad Dillon and his company, Dillon Industries, and we did so at trial. Unless the Court has a different preference, I will try to address briefly each one of the arguments that Elgin made in his brief in the order it made them. Starting first with this issue of the restrictive covenants, Judge Wilkinson, as you appreciate, restrictive covenants are disfavored. Courts do not, and this is true in every state, courts do not like to deprive employees of the ability to make a living, and they understand that employers and employees often have unequal bargaining power. So they are reviewed strictly in every state, and in particular, West Virginia. There is an exception, as Judge Berger recognized, for covenants that are ancillary to the sale of a business. In that case, courts will sometimes apply a more liberal standard under that situation, understanding that the parties may have more equal bargaining power. And this is one of these circumstances where it is in connection with the sale of a business, correct? It is in part, Your Honor, but I want to be very clear about this. The circumstances we have here in this case, no court has found a covenant to be ancillary to the sale of a business in a case like this, and let me explain what I mean by that. Here we have two agreements, an employment agreement and a sale agreement. Both contain restrictive covenants, and this is critical. The restrictive covenants in each agreement are different from one another. If you lay them side by side, they have different language, they have different definitions, and they run for different lengths of time. To anyone reading these contracts, it is apparent that each covenant was drafted for the agreement that it resides in. That is, the covenant in the employment agreement was drafted as ancillary to employment, and the one in the sale agreement is drafted as ancillary to the sale. And yet, Elgin urges this court, and they urge Judge Berger to treat both covenants, which are different from one another, as ancillary to the sale, and neither as ancillary to employment. No court has ever done this, and in fact, courts have expressly rejected the approach Elgin suggests here today. If I may, there is one case that is directly on point in this regard. It is from the Court of Appeals of Georgia, and here is what it has said about this precise issue. This court has consistently held that when parties execute separate contracts for the seller's sale of the business and the seller's subsequent employment, and each contract contains different restrictive covenants, the restrictive covenants in the employment contract are subject to strict scrutiny. Hilb v. Holley, 644 SE 2nd 862. I assume in your argument that they should be taken in tandem, so let's look at employment. What is wrong with that one in terms of, because both sides were represented by counsel, correct? Both sides were represented by counsel. So tell me, what is it about that? I'm accepting your argument it should not be considered in the same context as with the sale of a business, so let's say it's separate as employment. Go ahead. Yes. This contract, to the extent we're considering it ancillary to employment, Judge Gregory, is, as Judge Wilkinson recognized, very broad. It is very similar, almost identical, to covenants that have been rejected by other courts, including in West Virginia, as overbroad. It is overbroad because it's too long? The one-year provision is— One year is certainly not overbroad, is it? One year is not overbroad. Tell me what part is overbroad. The geographical extent of it, Your Honor. What's your response to counsel's argument, and it seems rather plausible to me, but we live in a world, as Tennessee Williams said in Glass Menagerie, blow out your candles because the world is lit by lightning. I mean, now people, just by internet, just all over the country, it's seamless, isn't it? Judge Berger understood this, Your Honor, and specifically addressed it in her opinion. She recognized that it can be appropriate to have a— Why is it not appropriate here? Because Elgin did nothing at summary judgment stage, Your Honor, to demonstrate that its business was truly national or international. Well, you don't have to—do you have to prove what the business is? The question is whether or not it's unreasonable in the context of the language in the contract, not whether they have to prove it. You almost said, well, why don't you sign that contract? What were you thinking? No, that's why we look at the language. Tell me about the language, why that's unreasonable. The language, Your Honor, essentially makes Mr. Dillon unemployable and deprives him of the ability to make a living. For how long? For one year, and it prevents him from directly or indirectly competing, which is very confusing. You said a restriction of one year of competition against an employment situation. That's unusual? The one year itself is not— Not at all. I would concede that point, Judge Gregory, but combined with everything else, one year nationally means that Mr. Dillon cannot go anywhere to work across the nation for an entire year. That is not reasonable under the law. He can go to work. He just can't be in the context of competing using information that he would know from that. He can work. It's not a restriction that you can't work anywhere. Am I wrong about that? He cannot use his lifelong trade, Your Honor. That's why he got $3.47 million. In other words, that's what you pay for. If I may, Your Honor. Yeah, go ahead. You may, but it may answer my question. The $3.47 million was under the sale agreement, and what the parties agreed to in the sale agreement is that he would not compete for a period of five years. That period expired. That is what the parties carefully agreed to and crafted as, for the sale of this business, Mr. Dillon, you will not compete with us for five years. I think that if there were trade secrets used or confidential information used, that that would be a separate claim from the question of the temporal and spatial breadth of the covenants themselves. I mean, I think it isn't, I guess your argument isn't the question of the breadth of the non-compete agreements separate and distinct from the question of whether there were trade secrets or confidential information used. Yes, Your Honor. The agreements had nothing to do with the trade secret issue. The trade secret elements are different. The non-compete agreements are saying that he can't even compete using legitimate methods. Correct, Your Honor. That's part of the breadth here is that no matter how legitimate his business decisions were and no matter how he went about his business, that that would be banned. Correct, Your Honor. Correct. But that doesn't foreclose counsel from saying, well, yeah, you can compete, but you can't use this confidential information and this and that. But I just see that as a different issue from the breadth because the breadth of it says, you know, we don't care whether you're using legitimate methods or not. You can't compete, and West Virginia doesn't like that. Correct, Your Honor. There are three covenants at issue here. There's a non-compete covenant, there's a non-solicit covenant, and there was a covenant to keep information confidential. That one was boundless in terms of time. It applied forever, and it was found by Judge Berger to be overbroad, relying on other decisions in West Virginia saying just the same. It prevented him from using information directly or indirectly for the rest of his life that he learned at Elgin and essentially made him unemployable was Judge Berger's ruling, and I think it was the correct one. This seems like a contract where the person is retiring. I mean, you read the contract as one where you say, okay, I'm getting $3.47 million because the way the terms are, you know, it's like you're going to go off and enjoy yourself in the sunset, right? That seems like to me what it is. If you're not going to do that, it's a contract maybe you wouldn't want to enter into. It's probably what I would have done, Your Honor, receiving that amount of money, but I think in this case that Mr. Dillon and Elgin agreed that they needed him for two purposes. They needed his business, and they paid a fair price for that, and he agreed not to compete for five years. They also wanted him to stay on as an employee, and he wanted to stay, and they negotiated a separate agreement for that purpose that had the one-year provision we're talking about that after leaving for one year he could not compete. And I want to make it clear this is not a case where someone sold their business and immediately double-crossed the purchaser and went out and began competing. Mr. Dillon stayed for nine years. This covenant was entered into in 2013. He didn't leave until 2022. He was a loyal employee the entire time. The five-year term for the non-compete expired. There was no unfairness here in any way. And I also— The closing counsel's argument is that you received a pretty nice hunk of change with $4.0 plus million, and part of what they were bargaining for was their right, as they see it, to be free from competition for a certain amount of time. So how do you—does it make a difference here that they see it as a bargain for the non-compete as simply one other thing that was on the table and it was a bargain for benefit? In other words, if the fact that the non-compete agreement is a product of a carefully negotiated contract, does that put it on a different footing from a non-compete agreement, which is just imposed on an employee who has very little bargaining power? What they're saying is that he had bargaining power, and what was bargained for was the non-compete, and you don't have that in a lot of situations where, as a part of the employment contract, the non-compete agreement is part of the employment contract, but you don't have any kind of equality of bargaining power in that situation. So what—just tell me what your response is, because non-compete agreements arise in different contexts, and some of them are just imposed right at the outset, but that's not the case here. And so tell me, does that make a difference in your view? What's your thought about that? Yes, Your Honor, I understand your question. The important point here is that we have two agreements. One covers the sale, and one covers employment, and they're both judged by different standards. And the one that covered the sale did have a bargain for provision. He received $3.47 million for the purchase of the business, and in exchange for that, he agreed not to compete with this company for five years. He honored that, and that provision expired. The only reason we're here is because that provision expired, and now Elgin wants to take the provision in the employment agreement and apply that as if it was part of the sale agreement. And the employment agreement must be read strictly, Your Honor, for all the reasons you've recognized. West Virginia policy and the policy of other states disfavors these very broad employment agreements in situations like this when they deal with the issue of employment. So it's two different standards. The sale agreement has to be judged by the liberal standard for agreements that are ancillary to the sale, but the employment agreement must be judged by the more strict standard reserved for strict scrutiny of employment agreements. Now, what you all have been talking about here all dealt with the pretrial rulings made by Judge Berger, correct? Yes, Your Honor. And there was a jury trial. Absolutely, Your Honor. And at the jury trial, you lost. There was a verdict for $11,000. We lost on one issue, yes, Your Honor. Pardon? We lost on one issue, the fiduciary duty issue. You lost a verdict? Yes. Did anybody challenge that verdict? Is that contested in this appeal? We have not challenged it. You didn't cross-appeal? No, we did not cross-appeal, Your Honor. They have challenged it, and I think their argument is the same. They're challenging a verdict that they won. Yes, Your Honor. As well as the trade— Can you do that in a federal court? Well, I think their argument is they lost on the trade secret claim, and they're challenging that. The other claim was a fiduciary duty claim, which they won on, but only to the tune of $11,000, to your point, Your Honor. And I think their argument is essentially that amount might have been greater if some of these evidentiary objections had gone their way, if Judge Berger, in their words, had not erred, is their position. But there's been no appeal lodged specifically as to the verdict, or has there? I don't know that their appeal goes to the size of the verdict so much. But you don't challenge the verdict? Absolutely not, Your Honor. And you lost the verdict? Correct, Your Honor. All right. See, I thought appeals were for losers. That's what I always kind of thought. That is normally the case, Your Honor, yes. Let's see, I've got 20. I'm over time, actually. Does the Court have any more questions that I can help with? Judge, do you have any? All right, thank you. Thank you very much. May it please the Court. My name is Scott Kaminsky, and I'm here today on behalf of Don Ritchie, who was an employee of Elgin and then later Dillon Industries. Your Honors, Judge Berger got her ruling with respect to Mr. Ritchie exactly right when she granted judgment as a matter of law at the close of all of the evidence in his favor as to Elgin's breach of duty of loyalty claim. And the reason that Judge Berger got this ruling exactly right was that Elgin failed in one of the critical elements of that claim, that being damages. As we all know, a plaintiff must prevail on all elements. And what Judge Berger's narrow ruling said was that the proof that was put forth by the plaintiff would lead a jury only to speculate as to the damages it might award if it did find that Mr. Ritchie breached his duty of loyalty. Well, the jury could extrapolate, couldn't they? And since the evidence was, well, he worked that many times, the allegation, of course, is just using that time for another purpose. So you say, over what period of time? Why couldn't they estimate that? You're saying that they have to quantify to the point that these are how many hours he was engaged, allegedly, into this, and a jury couldn't do that? I think that's right, Your Honor. And the reason is this, is that at trial, Elgin didn't attempt to quantify that period of time. They didn't take the emails that they put into evidence and say that this email was sent at this time and responded to at that time and add those up. They didn't even attempt to do that. In fact, in their briefing, they admit that the time that Mr. Ritchie spent working for Elgin but assisting Dillon was de minimis. Did they use that word? It's in their brief, I believe, at page 9. They said it was de minimis. De minimis. Which could be nominal damage. It could be nominal damage. And did you think the jury could give nominal damages? The problem in this case, Your Honor, is that no evidence was put before the jury as to what those nominal damages might be. There was no evidence of how much money he made his salary? That's it. That's just the point, Your Honor. The only evidence before the jury was Mr. Ritchie's entire salary for 2022 and his overtime pay for 2022. But there was no evidence put forward to the jury as to what period of time Mr. Ritchie was disloyal, if at all. And therefore, no way for a jury, as you suggest, Judge Geraghty, to extrapolate that. It would have been speculation. And that's why Judge Berger was exactly correct. The plaintiff called an expert witness, Morgan Winfrey. He testified on my cross-examination that none of his calculations with respect to lost profits were attributable to Mr. Ritchie. So that item of damages is out the door. And he testified that with respect to disgorgement, that he did not calculate the amount of time that Mr. Ritchie was disloyal, nor did he put forth any period of time for the jury to suggest that this is the period of time of disloyalty. That would have been a perfect opportunity for a hypothetical question by plaintiff's counsel to Mr. Winfrey. Mr. Winfrey, if a period of disloyalty began on this date and ended on this date, what portion of Mr. Ritchie's income ought to have been disgorged? And that was never put before the jury. There was no evidence before the jury that Mr. Ritchie was disloyal, if at all, for the entirety of 2022, nor that he was disloyal, if at all, for the period of time of overtime that he worked in 2022. But there was evidence that he was disloyal during the time that he was paid. I would disagree with that respectfully, Your Honor. That was a question. I didn't make a statement. But was there? I don't believe there was. But you just said they said he was doing something. Didn't they say that he was engaged in activities that was not in the interest of the people who were paying his salary? That is true, Your Honor. All right. So that means that it takes time to do something wrong. All right. So there's evidence that while he was being paid, he was engaged in conduct that he shouldn't have been involved in, on their allegations. Correct. De minimis. But that's what extrapolation is. They say, well, you're getting paid. And they knew how much money he made per year. That's correct, Your Honor. And what they knew was what he made in 2022. That was the evidence before the jury. And they didn't say what month he did this at all. That's correct. They didn't tell. No, how long it took any one activity to do. That's correct, Your Honor. Okay. I see the amount of time. That's all right. You okay? I'm fine. You may have any further questions. Thank you, Your Honor. Thank you. Ms. Lindsay. Thank you, Your Honors. Counselor, I know you don't have much time, but can you just answer a question about you put in, you didn't put any evidence in that a jury could extrapolate from what he was doing, that you alleged he did from a time standpoint. That's incorrect, Your Honor. I didn't think it was, but go ahead. The evidence in the record that the jury should have been able to consider includes the fact that he was engaged in conduct that he included time stamped and dated text messages, sending from Mr. Dillon to Mr. Ritchie, asking for work while Ritchie was on the clock. Emails, time stamped and dated of Mr. Ritchie responding to those requests the same day on the clock sending the requested information. They showed purchase orders, drawings, Elgin's engineering drawings that merely have Elgin's name removed and Dillon Industries added. The entire file share link for 24 by 60 machine, the most popular machine used by our most important customer, JG, who has national reach. We showed that those drawings, that link sent during working hours led to Mr. Dillon securing over a million dollars of work from JG in the first month of operation, work that he admitted he could not get without our drawings, without that information. And the restatement is clear. Our damages against Mr. Ritchie are not cabined by just what exact minutes is he being disloyal. You also look at the harm to Elgin and Elgin's foreseeable harm was tied to that lost profits analysis. And in the same morning, just minutes before the district court ruled on a very extreme judgment as a matter of law, high standards saying no evidence, the jurors shouldn't hear this. She also denied a motion to strike that testimony from our expert saying that this lost profits analysis is too speculative. She found it was not speculative and would go to the jury. You can't reconcile those two rulings on their face. And while there's claims that our damages expert didn't speak specifically to Mr. Ritchie, our damages expert did what damages experts do, calculate the numbers, calculate the harm. Assume complete liability, no common as to causation. But lay out Mr. Ritchie's compensation, Mr. Dillon's compensation, which the jurors should have seen. Laid out lost profits, which the court ruled were not speculative and appropriate for the jury to consider. But nevertheless, those claims were taken away from the jury with respect to Mr. Ritchie. You have seven different claims here, or maybe it's eight. I'm not sure. Do you think you might have been better off concentrating on one or two things which went wrong rather than throwing seven different claims against the wall? Your Honor, I appreciate that comment. And what our claims show is a cascading effect. If you look to the ruling on summary judgment that takes out these And I just want to point out that Weaver, a case in West Virginia, upheld a 15-year restrictive covenant, non-compete, in the sale of a business. And there are several cases that uphold this tandem integrated approach to covenants. With that error of taking that claim out of the case, that leads to the errors in the evidence. Because those documents, those documents that show Elgin's efforts to safeguard its information, those were necessary to prove a prima facie element of our trade secret claim. We could not even show the jurors the clear promises Mr. Dillon made day one to protect our information, and we had an obligation to show reasonable efforts to safeguard. We didn't have a shot of proving our trade secret claim without having those documents at play. If those documents had been at issue, there was no issue of confusion, and those documents should come in. You can see it as a domino effect or a cascading effect. With respect to the Rule 50 motions, again, a very, very high standard to take a claim away from a jury. We see evidence that the jurors should have considered, that they could have considered, in reaching and finding a reasonable verdict against Mr. Ritchie, who spent time on the clock at Elgin. Now, we do not say that the time is de minimis. That was an argument that was made by the other side. But regardless of whether that time is de minimis, the harm, the actual harm to Elgin is not de minimis. It was millions of dollars. Their business was gutted. All of their drawings were taken, hundreds of thousands of drawings. Mr. Ritchie made 19 different storage devices of our information, stole 11 employees, and as a result, Elgin was harmed. The jury should have heard those claims. I see that I am out of time, Your Honors. We thank you very much. Judge King, are you okay? I'm fine, thank you. We appreciate all of your arguments, and we'll come down and brief counsel and then proceed directly into our next case. Thank you.
judges: J. Harvie Wilkinson III, Robert B. King, Roger L. Gregory